## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

SHAWN A. MCGUIRE,

                Petitioner,

    vs.

BRAD HANSEN, Warden;

                Respondent.

**4:18CV3102**

**MEMORANDUM AND ORDER**

This is a habeas corpus case filed under 28 U.S.C. § 2254. The records have been submitted and the matter briefed. I deny the petition and dismiss it with prejudice.

### *Claims*

Earlier, I found the following claims to be potentially cognizable in this court.

> Claim One: Petitioner was denied the constitutional right to a fair trial by an impartial jury because the trial court's Instructions Nos. 9, 10, and 17 were constitutionally defective, contained an incorrect statement of the law on aiding and abetting, and instructed on uncharged crimes.
>
> Claim Two: Petitioner was denied the constitutional right to a fair trial because the evidence was insufficient to sustain his conviction under the theory of aiding and abetting.
>
> Claim Three: Petitioner was denied the constitutional right to prepare a meaningful defense because he was denied the right to subpoena witnesses including Kim Thomas, Gregory Beninato, Paris Capalupo, Robert Nave, and Jorge Palacios.

Claim Four: Petitioner was denied effective assistance of counsel because *trial counsel* (1) failed to propose jury instructions; (2) failed to object to the trial court's defective jury instructions; (3) failed to investigate and depose witnesses Abdul Vann, Robert Nave, Kim Thomas, and several others; (4) failed to conduct reasonable discovery to gather defense evidence to rebut the State's aiding and abetting theory; (5) failed to object to and move to exclude the ammunition and other evidentiary items found in or near the vehicle Petitioner was driving; (6) failed to have the 9-mm shells tested for DNA and fingerprints to show that Petitioner never handled the shells; (7) improperly advised Petitioner not to testify; (8) failed to adequately impeach and cross-examine State witness Cesar Avala-Martinez and offer evidence to refute his testimony; and (9) failed to offer testimonial and surveillance evidence that refuted the State's case.

Claim Five: Petitioner was denied effective assistance of counsel because *appellate counsel* failed to raise the following claims on direct appeal: (1) Petitioner was denied his right to summon witnesses Abdul Vann, Robert Nave, Kim Thomas, Cesar Avala-Martinez, and others for his defense; (2) the trial court's instructions to the jury were constitutionally defective and prejudicial; (3) Petitioner was denied his right to a speedy trial.

Claim Six: Petitioner was denied his constitutional right to a speedy trial in violation of due process.

Filing no. 5 at CM/ECF pp. 1-2.

### *Facts From the Nebraska Supreme Court's Direct Appeal Decision*

What follows is a condensed version of the Nebraska Supreme Court's lengthy statement of the basic facts of the murder as articulated on direct appeal:

After a jury trial, Shawn A. McGuire was found guilty of second degree murder[1] under a theory of aiding and abetting, use of a deadly weapon to commit a felony, and criminal conspiracy to unlawfully possess and deliver a controlled substance. The convictions were based on McGuire's involvement with a cocaine exchange that resulted in the murder of informant Cesar Sanchez–Gonzalez (Sanchez) by Robert B. Nave. . . .

. . .

Sanchez was an informant for the Greater Omaha Safe Streets Task Force. The task force also used Jorge Palacios as an informant. The task force is a joint operation involving the Federal Bureau of Investigation (FBI), the Omaha Police Department, the Bellevue Police Department, the Nebraska State Patrol, and, at times, the Drug Enforcement Administration. The purpose of the task force is to pool federal and state resources in order to target Mexican drug trafficking organizations and violent street gangs.

In November 2009, Sanchez informed FBI Special Agent Gregory Beninato that a group of Mexican drug traffickers, including Abdul Vann, wanted to conduct a drug transaction in Kansas City, Missouri. A year after the Kansas City drug deal, Vann went to Sanchez' automotive repair shop (auto shop) in South Omaha, Nebraska, in an attempt to purchase cocaine. With this information, "Operation Sheepdog" was formed by the task force with the purpose of identifying the Mexican drug trafficking organization and Vann.

. . .

---

[1] Petitioner was charged with first degree murder.

3

On September 28, 2010, "Operation Sheepdog" was conducting surveillance on an expected drug deal involving Vann at Sanchez' auto shop. Beninato observed Vann approach and communicate with an African–American male passenger of a Chevrolet Impala with Indiana license plates, which was parked in a fast-food restaurant's parking lot near Sanchez' auto shop. Vann then went in the direction of Sanchez' auto shop and eventually returned to get into the driver's seat of the Impala.

Later, a white Chrysler Sebring, which was a rental car with Missouri plates, drove to and parked in the fast-food restaurant's parking lot. An African–American male, later identified as McGuire, exited the Sebring to talk to the passenger of the Impala. McGuire then proceeded to Sanchez' auto shop.

A Hispanic male, later identified as Cesar Ayala–Martinez, driving a GMC Yukon Denali, also arrived and entered the auto shop. Shortly thereafter, McGuire left the shop with Vann, and both got into the Sebring. Vann exited after driving in a circle, and McGuire left. McGuire later came back as the passenger in a black Ford Explorer and reentered Sanchez' auto shop.

Ayala–Martinez testified to the events that occurred in Sanchez' auto shop. Present for the drug exchange on September 28, 2010, were Ayala–Martinez, Sanchez, Vann, McGuire, and possibly Palacios. Ayala–Martinez had agreed to sell Sanchez, the informant, 500 grams of powder cocaine in exchange for $13,500. Ayala–Martinez handed the cocaine to Sanchez, who handed it to McGuire. McGuire opened the package and tasted the cocaine.

Vann stated that "[i]t looks good," and McGuire paid Sanchez, who paid Ayala–Martinez.

. . .

On October 22, 2010, the task force again set up surveillance at Sanchez' auto shop for another proposed drug deal involving Vann. Prior to the deal, Sanchez and Ayala–Martinez agreed that Ayala–Martinez would sell Sanchez 1½ kilograms of powder cocaine in exchange for $40,500. The task force members were briefed that they were conducting surveillance on Vann, McGuire, and Ayala–Martinez.

Richard Lutter, a narcotics investigator for the Nebraska State Patrol, was conducting surveillance on October 22, 2010, as a member of the task force for "Operation Sheepdog." Lutter was exiting a parking lot near 24th and G Streets, where he observed McGuire standing next to a white Nissan. According to Lutter, McGuire was conversing with the passengers of the Nissan and was holding a black bag underneath his right arm. As Lutter drove past the vehicles, McGuire proceeded to a Sebring parked 20 yards behind the Nissan.

Beninato and FBI Special Agent Paris Capalupo were stationed in a parking lot with a direct view of Sanchez' auto shop. At approximately 12:50 p.m., a white Chrysler Sebring pulled up and parked on the south side of the auto shop. McGuire exited the vehicle.

At around the same time, Vann and two unknown individuals, later identified as Kim Thomas and Nave, arrived at the auto shop. Beninato observed McGuire interact with both Thomas and Vann as he exited the Sebring. McGuire then proceeded in the direction of Sanchez' auto shop. Sometime after McGuire entered the shop, Capalupo observed Nave put his hood over his head and pull a handgun from his waistband. Nave proceeded to enter Sanchez' auto shop. Beninato testified that as Nave entered, McGuire almost instantaneously exited.

The events that occurred in the auto shop were not witnessed by any members of the task force. Ayala–Martinez testified that on October 22, 2010, he went to Sanchez' auto shop to sell 1 ½ kilograms of powder cocaine. When he arrived at the shop, Ayala–Martinez went into the office where Sanchez, Palacios, and Vann were waiting. McGuire arrived alone, approximately 20 minutes later. McGuire wanted Vann to test the cocaine by "cooking" the powder cocaine with baking soda and water. Vann and Palacios left the store to buy baking soda.

Shortly after Vann and Palacios exited the auto shop, McGuire told Sanchez that he was going to get some tea and left the office. Ayala–Martinez testified that within seconds of McGuire's exiting, Nave entered the office. According to Ayala–Martinez, Sanchez then pulled a revolver out of his desk drawer and was attempting to open the chamber while the gun was pointing down. Before Sanchez could raise his weapon, Nave shot Sanchez two or three times. Nave then pointed the gun at Ayala–Martinez and asked for the cocaine. Ayala–Martinez pointed to the cocaine, and Nave ran out with it. Sanchez later died due to the gunshot wounds.

After witnessing Nave enter the auto shop with the gun, Beninato and Capalupo proceeded in their vehicle toward the auto shop. Capalupo observed Nave run out the door of the auto shop and fire several shots at Palacios. Thomas ran from the back of the building and began firing at Palacios and Ayala–Martinez, who had exited the building.

At this time, McGuire was in the driver's seat of the Sebring. After firing shots, Thomas and Nave ran straight to the Sebring and got in the vehicle. McGuire then sped off at a high rate of speed down I Street. Beninato and Capalupo pursued the vehicle.

The Sebring crashed head on into a pickup truck near 20th and I Streets. McGuire immediately fled from the driver's seat. Thomas and Nave exited the vehicle and huddled near the driver's-side rear door. Thomas complied with orders to get on the ground, while Nave fled. On the driver's side of the Sebring, 10 live rounds of ammunition, head-stamped or marked "9mm CCI Luger," were found.

Thomas was handcuffed and taken into custody at the scene of the accident. A search of Thomas revealed a pair of black gloves. Nave was apprehended by Lutter, who had also pursued the Sebring to the crash scene. Capalupo and another officer arrested McGuire after a 3- to 5-minute pursuit. A search of McGuire revealed a roll of cash with $20 and $50 bills on the outside and regular paper on the inside of the roll, in an attempt to make the cash roll appear to contain a larger amount of cash. The search also revealed keys to the Sebring, an electronic ignition key for a Nissan, a black Kansas City hat, and $3,858.

In the office area of Sanchez' auto shop, four Winchester 9–mm cartridge casings were found on the floor. No firearms were found in the office. A search of the white Nissan found a yellow sporting goods store bag on the passenger front seat containing a box of "CCI" ammunition, a pair of black gloves, and packaging material for black duct tape. Ten rounds were missing from the "CCI" ammunition box. Also found in the Nissan were three black head coverings.

Inside the Sebring, investigators found black duct tape consistent with the packaging found in the Nissan. A .357 Magnum pistol, a ".38 Special cartridge" revolver, a Smith & Wesson 9–mm pistol, and a .45–caliber Glock semiautomatic pistol were recovered from the Nissan. A firearms expert testified that the bullet recovered from Sanchez' body during the autopsy was fired from the 9-

mm Smith & Wesson. Each of the four casings found in the auto shop were also from the 9-mm Smith & Wesson.

The Nissan was owned by Monique Pridgeon. Pridgeon testified that she was dating McGuire on October 22, 2010. Pridgeon testified that, while dating, she had witnessed McGuire talk to Vann in Omaha and had witnessed McGuire talk to Thomas in Kansas City.

On October 22, 2010, Pridgeon allowed McGuire to borrow her car. The previous night, Pridgeon had gone to a sporting goods store to purchase bullets for the shooting range. She also purchased a little blue bag to hold change. When she returned home, she placed the blue bag on her dresser and put the bullets, which were in a yellow bag, in her garage. When she purchased the bullets, the box was sealed and she had not removed any bullets before or after placing the ammunition in the garage.

Pridgeon did not realize her bag and box of ammunition were missing until after she was questioned by investigators. She testified that although she thought the bag was blue—the bag found on McGuire was black–the fanny pack found on McGuire appeared to be similar to the bag she purchased. Pridgeon testified that only she, her mother, and McGuire had keys to her garage.

The State charged McGuire with the first degree murder of Sanchez, alleging two theories of the crime: felony murder and premeditated murder. It also charged him with use of a deadly weapon to commit a felony and criminal conspiracy to unlawfully possess and distribute a controlled substance.

*State v. McGuire*, 837 N.W.2d 767, 776–779 (Neb. 2013) (*McGuire I*); Filing no. 7-3, as (slightly) modified by Filing no. 7-4.

Appellate counsel was different than trial counsel. Petitioner had two trial lawyers at different times during the trial proceedings. The first was given leave to withdraw when he took a job with the prosecutor's office. The other was subsequently appointed to take the first lawyer's place, and Petitioner agreed with the substitution. A third lawyer was appointed to handle the appeal.

### *Issues Raised and Resolved on Direct Appeal*

Appellate counsel raised the following issues on direct appeal:

> McGuire appeals the convictions and argues that he was prejudiced when the district court allowed his trial counsel to withdraw prior to trial and by accepting McGuire's waiver of the conflict of interest created by the former trial counsel's new employment with the Douglas County Attorney's office, which was prosecuting McGuire in this case. McGuire also argues the court impermissibly allowed evidence of prior bad acts and used improper jury instructions. In addition, McGuire argues that his trial counsel was ineffective for failing to request jury instructions regarding robbery and attempted robbery as lesser-included offenses of felony murder. Finally, McGuire argues that the district court erred in upholding the convictions without sufficient evidence and in imposing excessive sentences.
>
> *McGuire I*, 837 N.W.2d at 776.

As to the withdrawal of counsel issue and the conflict of interest issue when the first lawyer was allowed to withdraw to take a position with the prosecutor's office, the Nebraska Supreme Court held it was within the trial court's discretion to allow the withdrawal and that as a result of the colloquy between the trial judge and Petitioner any possible conflict of interest arising out of that matter was waived by Petitioner. *McGuire I*, 837 N.W.2d at 782–784.

As for the objection under Rule 404(b) regarding the events of September 28, 2010, the Court carefully examined the evidence and found it admissible to show motive, intent, and knowledge to commit the robbery on October 22 and it was not unfairly prejudicial. *McGuire I*, 837 N.W.2d at 784–786 (noting that "under an aiding and abetting theory of felony murder premised on an underlying robbery, even if a coparticipant in the robbery caused the victim's death, the defendant aider and abettor can be convicted of felony murder if the State proves the defendant intended to rob the victim.").

Regarding the claim of ineffective assistance of counsel, that is, the claim that trial counsel should have requested jury instructions for the "lesser included" crimes of attempted robbery and robbery, allowing the jury to consider convicting McGuire of robbery or attempted robbery as opposed to first degree murder, second degree murder, or manslaughter, that alleged "error" was "likely beneficial" and not prejudicial. The Nebraska Supreme Court found that not only was Petitioner not prejudiced, but the alleged error was helpful to Petitioner, reasoning that under the felony murder rule, conviction of robbery under the facts of this case, could have resulted in a first degree murder conviction rather than a second degree murder conviction. *McGuire I*, 837 N.W.2d at 786–787.

Next, Petitioner argued that the trial judge erred in denying his proposed jury instruction regarding second degree murder and a "sudden quarrel" and also because the instruction given contained an error regarding "sudden quarrel manslaughter." The Nebraska Supreme Court found that the trial court erred in its formulation. However, the court found that the error was not prejudicial because there was no evidence to support a "sudden quarrel" instruction. *McGuire I*, 837 N.W.2d at 787–789 ("There is no evidence in this record upon which the jury could have concluded that McGuire (through the aiding and abetting instruction) committed sudden quarrel manslaughter instead of second degree murder.").

As for the alleged lack of evidence, the Nebraska Supreme Court extensively examined the record. It found the evidence was plainly sufficient. *McGuire I*, 837 N.W.2d at 789–791.

Finally, the court found that Petitioner's sentence was not excessive. The court noted, "this was a serious crime of violence. McGuire aided and abetted in the cold-blooded murder of Sanchez." *McGuire I*, 837 N.W.2d at 791–792.

The mandate was issued on February 4, 2014. Filing no. 7-1 at CM/ECF p. 3.

### *Issues Raised and Resolved in Post-Conviction Proceedings*

A detailed and lengthy motion for post-conviction was signed by Petitioner on January 21, 2015, but not filed by his retained counsel until February 6, 2015. Filing no. 7-18 at CM/ECF pp. 70–95. The Respondent concedes that the motion was timely. Filing no. 13 at CM/ECF p. 9.

After depositions and an evidentiary hearing, the motion was denied. Filing no. 7-18 at CM/ECF pp. 96-110. Retained counsel ended their service.

A fifth lawyer appealed the matter to the Nebraska Supreme Court. The Supreme Court set out what was at issue:

ASSIGNMENTS OF ERROR

McGuire claims the district court erred in failing to find that his trial and appellate counsel were ineffective, and in failing to rule on certain claims raised in his postconviction motion. More specifically, he claims (1) trial counsel was ineffective in (a) failing to properly examine Ayala-Martinez about where Nave pointed his gun prior to shooting Sanchez, (b) failing to call certain witnesses who would have provided testimony confirming

11

McGuire's ignorance of the plan to rob Sanchez of the cocaine, and (c) improperly advising McGuire about his rights to testify and to remain silent; (2) appellate counsel was ineffective for failing to raise trial counsel's failure to elicit testimony of a sudden quarrel; and (3) the district court failed to rule on his claims regarding (a) trial counsel's failure to object to the admission into evidence of the 9-mm ammunition and (b) trial counsel's failure to question or investigate the presence of gunshot residue on accomplices. Finally, McGuire claims that his postconviction counsel was ineffective for failing to present adequate evidence at the postconviction hearing to substantiate his claims, thereby depriving him of his state and federal constitutional rights to due process of law.

*State v. McGuire*, 910 N.W.2d 144, 150–51 (Neb. 2018) (*McGuire II*); Filing no. 7-5.

The Nebraska Supreme Court decided that the first claim—(1) trial counsel was ineffective in (a) failing to properly examine Ayala-Martinez about where Nave pointed his gun prior to shooting Sanchez, (b) failing to call certain witnesses who would have provided testimony confirming McGuire's ignorance of the plan to rob Sanchez of the cocaine, and (c) improperly advising McGuire about his rights to testify and to remain silent—was procedurally defaulted under Nebraska law. This was because he had separate counsel on the direct appeal and those claims had not been asserted or properly asserted as required by state law consistently applied. *McGuire II*, 910 N.W.2d at 151–152.

As for the next claim, ineffective assistance of appellate counsel for failing to allege that trial counsel was ineffective for failing to cross examine Ayala-Martinez regarding a "sudden quarrel" with the decedent, the court was not persuaded. Relying on the deposition of trial counsel, the Supreme Court found that trial counsel had a well-founded tactical reason for not pursuing that line of questioning. *McGuire II*, 910 N.W.2d at 152–153. Thus, because trial counsel's performance was not ineffective, direct appeal counsel could not have been ineffective either.

The next claim that the district court failed to rule on his claims regarding (a) trial counsel's failure to object to the admission into evidence of the 9-mm ammunition and (b) trial counsel's failure to question or investigate the presence of gunshot residue on accomplices was denied for two reasons. The court proceeded first to discuss part (b). Following standard Nebraska appellate practice and precedent, the court ruled that the claim was defaulted because it was not specifically assigned and not specifically argued in the petitioner's brief. *McGuire II*, 910 N.W.2d at 153. As to the failure of trial counsel to object to the ammunition, the court read the deposition of trial counsel who explained that he did not object because such an objection would surely have been overruled. The court ruled, "We agree." *McGuire II*, 910 N.W.2d at 154.

As to the last claim, that post-conviction counsel before the district court was ineffective, the court noted counsel was retained and the court doubted that the failure of post-conviction counsel to do or refrain from doing something raised a constitutional claim as the Petitioner "acknowledges that there is no constitutional right to effective assistance of counsel [in a post-conviction matter]." *McGuire II*, 910 N.W.2d at 154. Importantly, however, the court also ruled that post-conviction counsel was not ineffective. That is, "the claims asserted in McGuire's postconviction proceeding, even if proved, would not entitle him to any relief. Therefore, McGuire was not prejudiced by postconviction counsel's failure to present evidence to substantiate those claims." *Id.*

### *Legal Overview*

Three strands of federal habeas law intertwine in this case. They are the law of exhaustion and procedural default, the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court, and the standard for evaluating a claim of ineffective assistance of counsel.

I briefly set out those principles now, so that I may apply them later in a summary fashion as I review Petitioner's claims. I turn to that task next.

### *Exhaustion and Procedural Default*

As set forth in 28 U.S.C. § 2254:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> (A)    the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
>
> (ii)    circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, then in an appeal to the Nebraska Court of Appeals, and finally in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).[2]

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation marks omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause

---

[2] Here, by granting Petitioner's petition for bypass, the Nebraska Supreme Court exercised the discretion to take the case directly rather than require the petitioner to proceed first to the Nebraska Court of Appeals. *E.g.*, Filing no. 7-1 at CM/ECF p. 2.

and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### Nebraska Law Relevant to Procedural Default

Under Nebraska law, you don't get two bites of the post-conviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased."); *State v. Filholm*, 848 N.W.2d 571, 576 (Neb. 2014) ("When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.").

Moreover, a person seeking post-conviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying post-conviction relief in a murder case and stating: "An appellate court will not consider

as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.")

More specifically, if a person raises an issue in an initial motion for post-conviction relief but fails to raise it in an amended motion the claim is defaulted under Nebraska law. *State v. Armendariz*, 857 N.W.2d 775, 789 (Neb. 2015) (affirming denial of post-conviction relief in a murder case and stating that "[a]n amended pleading supersedes the original pleading, whereupon the original pleading ceases to perform any office as a pleading. It is clear the district court did not err in limiting its analysis to the motion that was before it—the amended motion.").

Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error in the brief. Otherwise the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

### Deference Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id*. at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

### The Especially Deferential Strickland Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id*. at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance

of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153 (2016) (a "fairminded jurist" could have concluded that repetition of anonymous tip in state-court cocaine-possession trial did not establish that the uncontested facts it conveyed were submitted for their truth, in violation of the Confrontation Clause, or that petitioner was prejudiced by its admission into evidence, precluding federal habeas relief under Antiterrorism and Effective Death Penalty Act (AEDPA); Petitioner could not establish that Petitioner's appellate counsel was ineffective, as appellate counsel was entitled to the "benefit of the doubt").

Moreover, to satisfy the prejudice prong of a claim of ineffective assistance of appellate counsel, it is not enough for the defendant to show that counsel's errors had some conceivable effect on the outcome of the proceeding. Instead, professional deficiencies on the part of appellate counsel will only provide constitutional relief if the deficiencies actually affected defendant's appellate proceedings. *Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir. 2005).

## *Analysis of Claims*

I next take the foregoing background and law and apply it to each of the claims.

### *Claim 1 and Claims 3-6.*

The Respondent argues that five of the six claims were procedurally defaulted. Filing no. 13 at CM/ECF pp. 15, 20–22. Those are claim 1 and claims 3-6. Petitioner essentially admits that those claims were procedurally defaulted. Filing no. 14 at CM/ECF p. 7; Filing no. 18 at CM/ECF pp. 1-2.[3] He tries to argue that the default should be excused under the cause and prejudice standard (1) because of errors of trial counsel, direct appeal counsel and post-conviction counsel before the district court[4] or (2) because of the miscarriage of justice exception (actual innocence). I find and conclude that these claims were procedurally defaulted without excuse.

Even if one assumes the proposition that the failure of counsel—at trial, on direct appeal or in post-conviction proceedings—might theoretically provide cause and prejudice for excusing a procedural default, the law requires Petitioner to explain what error was made that was so egregious that the cause and prejudice standard was satisfied. In assessing the cause and prejudice standard predicated on the asserted errors of counsel, courts apply (at the very least) the *Strickland* standard. *Armstrong v. Kemna*, 590 F.3d 592, 606 (8th Cir. 2010); *Clemons v. Luebbers*, 381 F.3d 744, 752–53 n. 5 (8th Cir. 2004). Simply stated, Petitioner has not explained in any detail

---

[3] This last filing was a reply to Respondent's reply. That filing was not authorized by the progression order. Filing no. 5.

[4] In *McGuire II*, 910 N.W.2d at 154, post-conviction counsel who appeared in the state district court was found not to be ineffective. Giving the required deference to the Nebraska Supreme Court as I must, I also find and conclude on the merits that there is no basis to conclude otherwise.

why counsel was ineffective or how he was prejudiced by the lawyers' alleged failures as set forth in claim 1 and claims 3-6.[5]

As for the actual innocence excuse, I find it entirely unpersuasive. I will devote greater detail to that issue next.

### Claim 2.

Claim 2 raises an assertion that the evidence was insufficient. That raises both the actual innocence excuse for a default and as a substantive basis for relief. Respondent does *not* assert that this claim is procedurally defaulted.

As for actual innocence, the exception is demanding and seldom met and "tenable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). "The actual innocence exception is concerned with claims of actual, not legal, innocence." *Pitts v. Norris*, 85 F.3d 348, 350 (8th Cir. 1996) (citing *Anderson v. United States*, 25 F.3d 704, 704 (8th Cir. 1994)). A petitioner must establish that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Brownlow v. Groose*, 66 F.3d 997, 999 (8th Cir. 1995) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

--------------------

[5] Petitioner does assert that his direct appeal counsel would not communicate with him or raise all the issues he wanted raised. First, that assertion is not true. The record establishes that direct appeal counsel wrote to Petitioner in response to questions posed by Petitioner and explained herself regarding issues to be raised on appeal. Filing no. 14 at CM/ECF p. 11. Second, appellate counsel is not required to raise every issue on appeal that a defendant may desire—counsel is entitled, indeed obligated, to use her discretion to raise only that which she believes are most persuasive. *See, e.g.*, *Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[A]ppellate counsel who files a merits brief need no (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.").

Typically, a claim of insufficiency of evidence does not raise a federal claim. However,

> We hold that in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 324, (1979).

I have carefully examined *McGuire I*. The court carefully examined the evidence and found it satisfied the proof beyond a reasonable doubt standard. The court wrote:

> McGuire argues that the evidence was insufficient to support his convictions for second degree murder, criminal conspiracy to unlawfully possess and distribute a controlled substance, and use of a deadly weapon to commit a felony. McGuire argues, summarized, that there was insufficient evidence establishing that he was a conspirator to the crimes and insufficient evidence to establish that he aided and abetted. Because there was considerable evidence demonstrating cooperation between McGuire and Nave, Thomas, and Vann, there is sufficient evidence in the record to support the convictions.
>
> McGuire was convicted of second degree murder and use of a deadly weapon to commit a felony under an aiding and abetting theory. Under Neb.Rev.Stat. § 28–304(1) (Reissue 2008), "[a] person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation." Further, under Neb.Rev.Stat. § 28–1205(1)(a) (Cum.Supp.2012), "[a]ny person who uses a firearm, a knife, brass or iron knuckles, or any other

deadly weapon to commit any felony which may be prosecuted in a court of this state commits the offense of use of a deadly weapon to commit a felony." It is undisputed that McGuire was not the shooter.

However, under Neb.Rev.Stat. § 28–206 (Reissue 2008), "[a] person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he [or she] were the principal offender." We have stated that aiding and abetting is simply another basis for holding one liable for the underlying crime. By its terms, § 28–206 provides that a person who aids or abets may be prosecuted and punished as if he or she were the principal offender. We have stated that aiding and abetting requires some participation in a criminal act and must be evidenced by some word, act, or deed. No particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. Mere encouragement or assistance is sufficient.

A rational jury could conclude beyond a reasonable doubt that McGuire intended to aid and abet the crime committed by Nave. Before the theft of the cocaine and the shooting, law enforcement surveillance described three individuals—McGuire, Nave, and Thomas—as being in proximity to each other and the Sebring immediately before the crime. While inside the auto shop, McGuire had a roll of cash filled with paper to make it appear like he had substantially more money. This indicates that McGuire never had intentions of buying the cocaine. When McGuire exited the shop, Nave instantaneously entered the shop with his gun drawn.

Furthermore, the fact that Nave entered the auto shop specifically demanding drugs indicates that he was working with McGuire and Vann. Only McGuire and Vann had purchased drugs from Sanchez through Ayala–Martinez before. There is no evidence that Nave was

involved in the prior deal. Therefore, the only logical way for Nave to know there was going to be a large amount of drugs in the auto shop was by being told by McGuire and Vann.

After Nave committed the murder and robbery, he fled with Thomas in the Sebring, driven by McGuire. Subsequent to his arrest, it was determined a box of 9-mm bullets had been taken from McGuire's girlfriend's garage. The box of 9-mm bullets, head-stamped "CCI," was found in the front seat of the Nissan; however, 10 rounds were missing. This was the same Nissan that Lutter had seen McGuire standing next to prior to the robbery. In fact, when McGuire was arrested, he had an electronic ignition key for a Nissan.

Investigators found 10 live 9-mm rounds, head-stamped "CCI," next to the Sebring where Nave had been standing. Nave was attempting to load a gun with the 9-mm rounds following the crash. In the Sebring, investigators found black duct tape that was consistent with the packaging in the Nissan. The evidence overwhelmingly supports that the Nissan and Sebring were intended to be used together in the crime. The evidence also overwhelmingly supports the jury's likely conclusion that McGuire provided Nave with 9-mm bullets, head-stamped "CCI."

Therefore, a rational jury could conclude that McGuire aided and abetted Nave in the murder of Sanchez (which involved a handgun) by providing information on the drug deal, providing a getaway car, and providing bullets. As such, the evidence is sufficient to uphold McGuire's convictions for second degree murder and use of a deadly weapon to commit a felony.

McGuire also unsuccessfully argues that his conviction for criminal conspiracy to unlawfully possess and distribute a controlled substance is not supported by the evidence. A

person is guilty of criminal conspiracy if the person intends to promote or facilitate the commission of a felony, agrees with one or more persons to commit that felony, and then the person, or a coconspirator, commits an overt act furthering the conspiracy.

The State claimed that McGuire conspired to possess and then distribute cocaine. In relevant part, Neb.Rev.Stat. § 28–416(1) (Cum.Supp.2010) makes it unlawful "for any person knowingly or intentionally . . . [t]o manufacture, distribute, deliver, dispense, or possess with intent to manufacture, distribute, deliver, or dispense a controlled substance." Cocaine is a controlled substance. So we must affirm McGuire's conviction where there is evidence from which a rational jury could find beyond a reasonable doubt that he intended to promote or facilitate the crime of possession with intent to distribute cocaine, that he agreed with others to commit that crime, and that he or another coconspirator committed an overt act in furtherance of the conspiracy.

The evidence supports that McGuire conspired with Vann, Thomas, and Nave to acquire possession of cocaine with intent to distribute it. All of the evidence supporting McGuire's aiding and abetting Vann also applies here. Ayala–Martinez testified that McGuire wanted to test the 1½ kilograms of powder cocaine before purchasing. It was McGuire who had the roll of cash to "purchase" the cocaine. It was McGuire who aided and abetted Nave in the murder of Sanchez for the cocaine. And the cocaine was found in the Sebring driven by McGuire after he had crashed the vehicle. From these facts, a rational jury could conclude that McGuire conspired to possess cocaine with the three other men.

*McGuire II*, 837 N.W.2d at 789–91.

So, it is obvious to me, after giving the Nebraska Supreme Court the legal and factual deference it is due, that Petitioner is not actually innocent, and the evidence satisfies the proof beyond a reasonable doubt standard thus affirmatively disproving Petitioner's second claim.

## *Certificate of Appealability*

A petitioner cannot appeal an adverse ruling on his or her petition for writ of habeas corpus under § 2254 unless he or she is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484–485 (2000). I have applied the appropriate standard and determined Petitioner is not entitled to a certificate of appealability.

IT IS ORDERED that the petition, Filing no. 1, is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. A separate judgment will be issued.

February 4, 2020                    BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge